# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3154-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

S.N.H. and UNKNOWN FATHER,

    Defendants,

and

M.H.,

    Defendant-Appellant.

_____

IN THE MATTER OF S.N.H.,
a minor.

_____

Submitted May 28, 2026 – Decided July 16, 2026

Before Judges Mayer and Jacobs.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0106-25.

Jennifer N. Sellitti, Public Defender, attorney for appellant (David A. Gies, Designated Counsel, on the briefs).

Jennifer Davenport, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Michelle McBrian, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant M.H. (Max) appeals from two April 25, 2025 orders: (1) a fact-finding order finding that he abused or neglected minor S.N.H. (Sadie), the biological daughter of his live-in girlfriend, S.N.H. (Stella); and (2) an order dismissing him from the case.[1] We affirm.

---

[1] We use pseudonyms to refer to the parties and their family members to protect their privacy and preserve the confidentiality of these proceedings. R. 1:38-3(d)(11), (12). Moreover, because mom and daughter share the same initials, we refer to them by pseudonyms to avoid confusion.

A-3154-24

I.

Stella is the biological mother of Sadie, born in 2010, and Shane, born in 2011.[2] In early 2024, Sadie and Shane, who were living with relatives elsewhere, returned to New Jersey, and moved into Max's one-bedroom apartment with Stella. Stella had a history of substance abuse prior to any involvement with the Division of Child Protection and Permanency (Division), including drug use and periods when her children lived with relatives due to her housing instability.

In August 2024, Sadie reported to police that Max "touched her inappropriately." Consequently, the Division investigated the allegations. Sadie told a Division caseworker that, while watching television in bed with her mother and Max, Stella left to run errands. Sadie remained on the bed with Max, who then "moved over to her and began rubbing on her thigh and butt." Max's phone rang, and Sadie quickly got up and ran to the bathroom. She texted her aunt, who came to pick her up. Sadie did not call her mother, believing Stella would not address Max's conduct. Sadie denied prior inappropriate touching but reported Max had made uncomfortable comments about her body.

A Division caseworker also interviewed Stella, who confirmed Max made

---

[2] Stella is not participating on appeal.

A-3154-24

comments about Sadie "getting bigger" but claimed he was referring to her face. Max denied touching Sadie, suggesting Sadie had fabricated the allegation because she was in trouble for inappropriate photographs found on her phone and because he was the "sterner" party in disciplining the children.

The Division referred Sadie for a psychosocial evaluation with Dr. Jiwon Yoo, Ph.D. Dr. Yoo found Sadie credible, explaining Sadie was "experiencing trauma[-]related intrusive thoughts" and that her "freez[ing]" up when Max touched her is a very common reaction especially for children in like-situations.

The Division substantiated Max for sexual abuse and filed for custody of both children. In December 2024, the court granted the Division custody of Sadie.

On April 22, 2025, three days before the scheduled virtual fact-finding hearing, Max requested to proceed in person and to represent himself. The court granted the in-person request but denied self-representation as untimely. Trial began on April 25, 2025. At trial, the Division presented Dr. Yoo, the Division caseworker, and Sadie as witnesses. Max testified on his own behalf.

Max sought to call Stella as a witness. He explained Stella would testify he was on the phone with her during her absence from the apartment on the night in question, that Sadie used her own blanket when she was on their bed, and that

the cat was bothering Sadie, thus accounting for the unwanted touching. The court denied Max's request, ruling the testimony he sought to elicit was either not in dispute, could adequately be explored through the testimony of the existing witnesses, or its exclusion would not prejudice him because it was not relevant. The court noted Max's request could be renewed as the case developed. Max renewed his request at the close of the Division's case, and the court denied the application for substantially the same reasons.

Sadie testified, referring to Max as her "stepdad," and reiterated her account of what occurred. She produced text messages with her aunt exchanged while she was in the bathroom hiding from Max. Sadie testified there was no cat in the bed at the time of the incident and it was definitely not a cat that touched her. She recalled that following the incident, Max told her "it happened one time, so [she] shouldn't have told anyone." Sadie confirmed on cross-examination she was in her own blanket on the bed that night and admitted to being sexually active with her peers and to punching Max in the face when he disciplined her regarding the images on her cell phone. Lastly, the Division caseworker who investigated Sadie's allegation testified as to contents of the investigation summary report.

Without objection, Dr. Yoo was qualified as an expert "in child

A-3154-24

maltreatment, abuse and neglect." Dr. Yoo recounted her interview with Sadie and Sadie's experience of "intrusive thoughts related to what happened, that could be considered as trauma[-]related symptoms." Asked by Sadie's attorney to elaborate regarding these symptoms, the following colloquy ensued with Dr. Yoo:

> [LAW GUARDIAN]: Just to be clear, in your evaluation you found that [Sadie] was experiencing symptoms of trauma, specifically as a result of [Max] touching her; is that correct?
>
> [DR. YOO]: Correct.
>
> [LAW GUARDIAN]: Okay, and those symptoms would . . . include her thinking of the sexual abuse incident by [Max] two to three times a week?
>
> [DR. YOO]: Correct. Yeah those are the intrusive thoughts that she experienced.

In his testimony, Max described his role in the household.

> . . . I used to participate in their schooling, real heavily. As far as going to teacher/parent conferences. I had all their teacher's phone numbers. Their teachers . . . had my phone numbers. They would call me if someone was skipping class. I was primarily responsible for taking [Sadie] to school every day and picking her up.
>
>     . . . .
>
> . . . I was pretty much the discipliner in the home, as far as making sure everyone did their homework, making sure everyone did things that was asked of them, their

A-3154-24

responsibilities as far as keeping their areas clean. Behaving themselves in school. Behaving themselves at home.

Max denied any inappropriate touching, attributing the cause of Sadie's report to behavior of the family's cat. He recounted,

> [Sadie]'s . . . laying there under the cover[s]. And I was on Facetime with [Stella]. The way I was . . . on the phone with her mom, her mom could see me and [Sadie]. . . . I asked [Stella] to Facetime me, because I was trying to tell her that the cat keeps messing with [Sadie]. I . . . kept telling [Stella], . . . "look how the cat keep messing with [Sadie,] not letting [Sadie] sleep."

Max acknowledged Sadie left the bedroom and went to the bathroom but stated "I thought she was going somewhere else to get away from the cat that kept bothering her from trying to sleep." Max added he and Sadie were each wrapped in blankets, presenting an "extra obstacle that would have been faced by someone trying to molest a child through two separate blankets."

In rendering its decision, the court observed "[t]he entirety of this case is based on credibility." In that regard, it did not find Max's testimony entirely credible, highlighting inconsistencies and questionable aspects of his testimony—particularly finding it "preposterous that . . . blankets are so heavy you couldn't feel anything."

7

The court found Dr. Yoo "to be [an] extraordinarily credible witness" and "was particularly impressed with [Sadie's] testimony before the [c]ourt," finding it to be "straightforward and clear."

> . . . She came in and testified very matter of factly about what happened on the day in question. Never once through her testimony did her demeanor demonstrate that she was trying to lead the [c]ourt or the listeners to a different set of facts or add additional information that was not presented or asked of her. She very carefully addressed everyone's questions, including the cross-examination[,] directly.

In conclusion, the court stated:

> This boils down to a very simple thing. Has the Division proven its case that it is more likely true that he touched her on the butt than it is all of these other versions about what could have happened? It isn't. The Division has proven that it is more likely true than not true, that on this day there was a touching of the butt. That he did in fact grab her butt. That she did in fact go into the bathroom and call or text . . . her aunt to say that it did in fact occur.
>
> Now, without doubt under the statute [Max] – his own definition go into the position of being a . . . parent and subject to Title 9, because he exercised all of this control that he well-articulated during the course of this case. The question is was it sexual assault? The statute is clear, defines it, [N.J.S.A.] 9:6-8.84 and it talks about touching the intimate parts. And it references . . . [N.J.S.A.] 2C:24-4, 2C:14-1[(e)] and intimate parts include the following body parts; sexual organs, genital area, anal area, inner thigh, groin, buttock or breast of a person. This is a buttock. And it . . . is a prohibited

8

act for him to have grabbed her butt on the day in question.

I'm satisfied that that is legally sufficient under our abuse and neglect statute, and I find that . . . the Division has substantiated a case for abuse and neglect against [Max].

On appeal, Max argues the trial court erred in denying his request to represent himself with the assistance of standby counsel if needed, denying his request to call Stella as a witness, and finding he acted in the role of a parent or guardian.

## II.

Our review of the Family Part's abuse or neglect finding is "limited." N.J. Div. of Youth & Fam. Servs. v. S.H., 439 N.J. Super. 137, 144 (App. Div. 2015) (citing Cesare v. Cesare, 154 N.J. 394, 411 (1998)). The court must determine whether the decision "is supported by 'substantial and credible evidence' [i]n the record." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007)).

"Because of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Cesare, 154 N.J. at 413; see also N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010). Appellate courts should "defer to the factual findings

9

of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record."  N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting M.M., 189 N.J. at 293). A family court's decision should not be overturned unless it went "so 'wide of the mark'" that reversal is needed "to correct an injustice."  F.M., 211 N.J. at 448 (quoting E.P., 196 N.J. at 104).

"Title 9 controls the adjudication of abuse and neglect cases."  M.C. III, 201 N.J. at 343 (citing N.J.S.A. 9:6-8.21 to -8.73).  "Title 9's main focus is not the 'culpability of parental conduct' but rather 'the protection of children.'"  Dep't of Child. & Fams., Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 178 (2015) (quoting G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 177 (1999)).

Our Supreme Court has recognized "that a parent has the right to represent [themselves] in an action to terminate [their] parental rights, with the assistance of standby counsel at the court's discretion."  N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 148-49 (2018).  However, the Court recognized a parent's right of self-representation "is by no means absolute" and must "be exercised in a manner that permits a full and fair adjudication of the dispute and a prompt and equitable permanency determination for the child.  The

parent must inform the court of [their] intention to appear [self-represented] in a timely manner, so as to minimize delay of the proceedings." Id. at 132. In R.L.M., the Court explicitly held the trial court "acted well within its discretion" in denying a self-representation request because of the timing and ambiguity of the request. Ibid.

Max argues the court abused its discretion in denying his request as untimely. We disagree. Max completed an application for public defender representation, received the appointment of an attorney from the public defender's office, and that assigned public defender represented him at multiple hearings. Max waited until the eve of trial to request permission to be self-represented. As the court noted, the scheduling of a Title 9 fact-finding hearing is critical, and granting Max's request just days before the hearing would have caused unnecessary delays in resolving the case. Thus, the court did not err in its ruling.

Next, we address Max's argument regarding denial of his request to call Stella as a witness. Trial judges have broad discretion to control court proceedings. Martin v. Newark Pub. Schs., 461 N.J. Super. 330, 340 (App. Div. 2019). "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence to: (1) make those procedures

11

effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." N.J.R.E. 611(a). A trial court's decision to exclude a lay witness's testimony is reviewed for abuse of discretion. State v. Sanchez, 247 N.J. 450, 465 (2021). Based on the record, the court did not abuse its discretion in finding Max's request untimely. Further, the record reflects that testimony from Stella—such as the phone call, the presence of blankets, and Sadie's prior behavior—were either undisputed or irrelevant to the issue before the trial court. We are satisfied the court's ruling was not an abuse of discretion.

Lastly, Max claims he is not subject to a Title 9 abuse and neglect action because he is not Sadie's "parent or guardian." A "parent," "custodian," or other individual subject to a Title 9 abuse and neglect action includes:

> "Parent", as used in this chapter, shall include the stepfather and stepmother and the adoptive or resource family parent. "The person having the care, custody and control of any child", as used in this chapter, shall mean any person who has assumed the care of a child, or any person with whom a child is living at the time the offense is committed, and shall include a teacher, employee or volunteer, whether compensated or uncompensated, of an institution as defined in [N.J.S.A. 9:6-8.21(a)] who is responsible for the child's welfare, and a person who legally or voluntarily assumes the care, custody, maintenance or support of the child.
> [N.J.S.A. 9:6-2.]

Under N.J.S.A. 9:6-8.21(a), "parent or guardian" means "any natural parent, adoptive parent, resource family parent, stepparent, paramour of a parent, or any person, who has assumed responsibility for the care, custody, or control of a child or upon whom there is a legal duty for such care."

In his own words, Max acknowledged acting as the primary "discipliner" of Sadie and her brother, attended parent-teacher conferences for Sadie, and was the school's parent contact for her. Consequently, although Sadie lived with Max for less than six months, the interaction between Max and Sadie was ongoing and substantial. Assessed in context derived from the unrebutted testimony, Max's role met the statutory definitions for "parent or guardian" in that he had assumed responsibility for Sadie's care and control. N.J.S.A. 9:6-2 and -8.21(a).

Moreover, because this issue was not raised below, the plain error rule governs. The "rule provides that '[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result.'" N.J. Div. of Child. Prot. & Permanency v. C.R.A.G., 479 N.J. Super. 504, 529 (App. Div. 2024) (quoting R. 2:10-2). Max's argument does not meet the plain error threshold.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Healy

Clerk of the Appellate Division

13

A-3154-24